# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 26 2020, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency – Appellate Division

Joel M. Schumm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ausencio Garcia Rodriguez,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | October 26, 2020<br><br>Court of Appeals Case No.<br>20A-CR-324<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Barbara Crawford, Judge<br><br>Trial Court Cause No.<br>49G01-1804-F1-13278 |

**Mathias, Judge.**

[1] Ausencio Garcia Rodriguez appeals his conviction for Level 1 felony child molesting, claiming that the trial court committed reversible error when it admitted evidence of inconclusive scientific test results.

[2] We affirm.

## Facts and Procedural History

[3] On the morning of March 30, 2018, Renee Hill left home—where she lived with her ten-year-old daughter O.G.—to begin her first day of work at a new job. O.G. remained behind under the care of her mother's boyfriend, Rodriguez, who the young girl considered family. Sometime that afternoon, the two were playing inside when O.G. tripped over a chair and fell to the ground, landing on her back. Rodriguez got up from the couch and joined the young girl on the floor where he pulled her pajama pants down and licked her vagina. She repeatedly asked him to stop, and Rodriguez eventually complied. O.G. then got up and went to her room "to try and hide" that she was upset "because [she] wanted to be safe." Tr. Vol. 2, p. 140.

[4] Soon after, O.G. left her house and walked the short distance to the home of her best friend M.M. Upon entering, O.G. was so upset that she "couldn't even speak." *Id.* at 190. M.M. and her mother knew that something was seriously wrong. So, with M.M.'s help, O.G. called her mother who promptly left work. After O.G.'s mother arrived, she spoke with her daughter for a few minutes, and the pair left for the hospital.

[5]     At the hospital, O.G. was examined by a forensic nurse who collected two internal and two external vaginal swabs for forensic testing. O.G. and her mother also met and spoke with a family case manager from the Department of Health Services. They met with the case manager again a few days later for a more formal interview. Detective Nicolle Flynn watched that interview through a live video feed, and afterwards, she acquired a search warrant to obtain a DNA sample from Rodriguez.

[6]     Law enforcement eventually tracked down Rodriguez, and he was interviewed by Detective Flynn and a second officer who assisted as a Spanish–English interpreter. Rodriguez denied O.G.'s specific allegation, but he admitted to watching the young girl on March 30. He also acknowledged that, while "play biting" with O.G., it was possible that his mouth went near her vaginal area. Conf. Ex. Vol. pp. 86–87. After the interview, Detective Flynn arrested Rodriguez.

[7]     Meanwhile, two crime-lab forensic scientists examined the internal and external genital swabs taken from O.G. Shea Anderson performed the serological testing on the swabs to identify the presence of saliva. This test assesses the amount of the enzyme amylase in a given sample. Amylase "helps with digestion in [the] mouth" and is thus expected to be at elevated levels in saliva. Tr. Vol. 2, p. 28. But because there is "nothing unique to saliva," the test cannot confirm its presence. Tr. Vol. 3, p. 9. Instead, based on the amount of amylase present, the test produces one of three outcomes: (1) no indication of saliva; (2) inconclusive for saliva; or (3) indicative of saliva. The swabs here were inconclusive for

saliva—each contained amylase, but not at a high enough level to be indicative. The samples were then sent for DNA analysis.

[8] Tonya Fishburn performed the DNA testing on the swabs. Because "there was so much female DNA present," she was only able to perform Y-STR testing and not traditional STR testing. *Id.* at 69. The latter evaluates male and female DNA to create a profile unique to an individual; the former looks for the Y chromosome, which is found only in male DNA. If enough Y-STR DNA is obtained, Fishburn can produce a comparable profile that is used to identify a particular patrilineal line—grandfather, father, son, grandson, etc. To create the comparable profile, Fishburn tests "25 different areas on the DNA," and she must obtain results from at least five of those locations. *Id.* at 83, 86.

[9] Fishburn observed male DNA on both sets of vaginal swabs, but she was only able to create a comparable profile for the external sample. For the internal swabs, though male DNA was present, Fishburn was unable to retrieve DNA data from five of the twenty-five locations tested. Thus, the profile was "inconclusive due to insufficient sample data." Conf. Ex. Vol. p. 10. But the comparable Y-STR DNA profile from the external swabs was consistent with Rodriguez's Y-STR DNA profile to the highest statistical degree possible based on the crime lab's database.

[10] The State ultimately charged Rodriguez with two counts of felony child molesting. Prior to trial, Rodriguez filed a motion in limine that, in part, sought

to exclude evidence of the inconclusive test results.[1] After a hearing, the trial court summarily denied the motion. The evidence was introduced over objection at trial, and the jury found Rodriguez guilty as charged. The trial court subsequently vacated one of the convictions due to double jeopardy concerns and sentenced Rodriguez accordingly. He now appeals.

## Standard of Review

[11] Rodriguez argues that the court committed reversible error by admitting evidence of the inconclusive scientific test results. A trial court has broad discretion in ruling on the admissibility of evidence, and thus we review an evidentiary ruling for an abuse of that discretion. *Scanland v. State*, 139 N.E.3d 237, 242 (Ind. Ct. App. 2019). An abuse of discretion occurs if the trial court's decision clearly contravenes the logic and effect of the facts and circumstances, or if the court misinterprets the law. *Id.* Yet, even when a trial court abuses its discretion in admitting evidence, the error is harmless unless it affects the substantial rights of a party. Ind. Trial Rule 61.

## Discussion and Decision

[12] Rodriguez asserts that evidence of the inconclusive results from both the serological test for saliva and the Y-STR analysis of the internal genital swabs should not have been admitted for two reasons: (1) it is irrelevant, Ind.

---

[1] Notably, Rodriguez did not seek to exclude evidence of the Y-STR analysis for the external genital swabs. Tr. Vol. 2, p. 11.

Evidence Rules 401 & 402; and (2) even if the evidence is relevant, it is unduly prejudicial, Ind. Evidence Rule 403. Rodriguez then argues that the court's error was not harmless. We disagree and address each contention in turn.

### I. *The trial court did not abuse its discretion in admitting evidence of the inconclusive test results.*

[13] Evidence is relevant if it has any tendency to alter the probability of a material fact. Evid. R. 401. This standard is "a low bar," and trial courts enjoy broad discretion "in deciding whether that bar is cleared." *Snow v. State*, 77 N.E.3d 173, 177 (Ind. 2017). Generally, evidence that clears this low bar is admissible. *See* Evid. R. 402. Yet, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury . . . ." Evid. R. 403.

[14] Rodriguez first argues that the inconclusive test results were not relevant, relying heavily on *Deloney v. State*, 938 N.E.2d 724 (Ind. Ct. App. 2010), *trans. denied*. But he reads that too decision too broadly, and we decline to extend its holding to the challenged evidence here.

[15] The *Deloney* panel addressed the admissibility of a mixed sample of nonmatch crime-scene DNA evidence that was unaccompanied by statistical data to show the probability of an individual's contribution. *Id.* at 729–30. There, a forensic scientist used STR analysis on a mixed sample of DNA found on a hat that was recovered from the scene of a murder. *Id.* at 728. From the DNA profile obtained, the scientist could not either exclude or include Deloney "as one of

the people who deposited" DNA on the hat. *Id.* at 729. And, "because the mixed sample did not allow for statistical analysis," the scientist could not calculate the probability that the DNA came from Deloney. *Id.* A panel of this court, in finding this particular DNA evidence irrelevant, aptly noted, "Without statistical data, evidence of a non-match is meaningless, and does not assist the trier of fact in determining the guilt or innocence of the defendant." *Id.* at 730.

[16] Rodriguez argues that, just as in *Deloney*, evidence of the Y-STR analysis of the internal swabs is irrelevant and that the logic of that case "should extend to the serology report." Appellant's Br. at 10, 12. Under the facts of this case, we disagree.

[17] The same concerns addressed by the *Deloney* panel are not present here for two reasons. First, the DNA evidence in *Deloney* is distinct from the challenged evidence. Unlike the STR analysis in *Deloney*, which creates a unique DNA profile that is used to identity a match, neither the serological test for saliva nor the Y-STR analysis can be used to "match" a particular individual. Indeed, for the serological test, the "most" a scientist can say is that a sample is "inconclusive or indicative of" saliva. Tr. Vol. 3, p. 28. And, for the Y-STR analysis, even when there is enough male DNA to create a comparable profile, it "is not unique to an individual." *Id.* at 72. Thus, the *Deloney* panel's concern with "DNA evidence that does not constitute a match" is not implicated in the same way here. 938 N.E.2d at 730.

[18] Second, this case does not involve a mixed sample of male DNA or the question of identity. There is no dispute that Rodriguez watched O.G. on the day in question, and there is no suggestion that the male DNA profile obtained from the internal swabs was a mixed example. As a result, this case does not involve "statistical data regarding the probability of a defendant's contribution to a mixed sample." *Id.*

[19] Further, under the facts of this case, the inconclusive test results are relevant—they could assist the jury in determining Rodriguez's guilt or innocence. Though the swabs were inconclusive for the presence of saliva, they contained the enzyme amylase, which "is found in high levels in saliva." Tr. Vol. 3, p. 9. Additionally, while there was not enough male DNA to obtain a comparable Y-STR profile from the internal swabs, they still contained male DNA. The presence of amylase and male DNA on the samples, as opposed to an absence of either, makes it more probable that O.G. was molested in the manner she described. Thus, the trial court acted within its discretion in finding that evidence of the inconclusive test results cleared the low bar for relevance.

[20] The court also acted within its discretion in finding that the relevant evidence should not have been excluded under Indiana Evidence Rule 403. Rodriguez disagrees, arguing that allowing the scientist "to discuss saliva presented the potential of confusing the issues and misleading the jury." Appellant's Br. at 13. He similarly asserts that permitting evidence of the Y-STR analysis for the internal swabs, "posed a strong danger" that the jury "could assume additional

information or form improper conclusions." Appellant's Br. at 11. Neither contention is persuasive.

[21] We initially note that Rodriguez has not explained how the serological evidence could have confused or misled the jury; nor has he identified what improper assumptions or conclusions the jury may have drawn from the Y-STR analysis of the internal swabs. And, after reviewing the extensive testimony from the forensic scientists, we cannot say that any prejudicial impact of the challenged evidence outweighs its probative value.

[22] For the serological evidence, Anderson explained to the jury what serology is and how the testing is performed; the limitations of serological testing for saliva; what amylase is and where it is found; the different threshold levels of amylase for a saliva test and what those thresholds indicate; why testing on the samples produced inconclusive results; and what those results meant. *See* Tr. Vol. 3, pp. 5–9, 12–17, 19–31. For the DNA evidence, Fishburn thoroughly informed the jury on the differences between traditional STR testing and Y-STR testing; the limitations of Y-STR analysis; why only Y-STR analysis was done on the swabs and how that testing was performed; why testing on the internal swabs produced an inconclusive result; and what that result meant. *See id.* at 66–69, 71–87. In short, the jury was fully informed on the particulars of each test and the challenged inconclusive results.

[23] We thus find ample evidence to support the trial court's conclusion that the probative value of the inconclusive test-result evidence was not substantially

outweighed by a danger of confusing the issues or misleading the jury. *See Ivory v. State*, 141 N.E.3d 1273, 1281–82 (Ind. Ct. App. 2020), *trans. denied*. Yet, even if we agreed with Rodriguez that the trial court erred in admitting the challenged evidence, reversal still would not be required.

## II. *Any error in admitting evidence of the inconclusive test results was harmless.*

[24] The improper admission of evidence is harmless error "if there is substantial independent evidence of guilt and we are satisfied that there is no substantial likelihood the challenged evidence contributed to the conviction." *Laird v. State*, 103 N.E.3d 1171, 1178 (Ind. Ct. App. 2018), *trans. denied*. Here, even if the trial court erred in admitting the challenged evidence, the error was harmless—the jury was presented with substantial independent evidence supporting Rodriguez's conviction.[2]

[25] The evidence against Rodriguez consisted of detailed, unequivocal testimony from O.G.—corroborated by several other witnesses—as well as uncontested DNA evidence. O.G. thoroughly described to the jury how Rodriguez molested

---

[2] We disagree with Rodriguez's contention that "[t]he State's closing argument relied forcefully on the inadmissible DNA and serology evidence." Appellant's Br. at 13. True, the State mentioned the inconclusive test results a few times. But a review of the entire closing argument reveals that the prosecutor spent a majority of her time highlighting O.G.'s testimony and the many reasons why the jury could believe her account. But even if any of the prosecutor's comments were inapt, the jury was properly instructed that statements made by the attorneys are not evidence. Appellant's App. p. 159; Tr. Vol. 3, p. 107. We also reject Rodriguez's reliance on the length of deliberations as evidence that any error was not harmless. The jury could have deliberated for over four hours for any number of reasons. For example, the jury, about seventy-five minutes after being excused, asked to view the video of Rodriguez's hour-plus long interview. Simply put, on this record, we decline to make any inference based on the length of deliberations.

her on March 30 and her subsequent actions that day. O.G.'s account was then substantiated by several witnesses, including the family case manager, her mother, her best friend M.M., and M.M.'s mother. In fact, the jury even listened to Rodriguez—in his recorded interview—confirm a majority of O.G.'s testimony. He admitted to watching and playing with O.G. that day, and he acknowledged that his mouth may have gone near her vaginal area while "play biting." Conf. Ex. Vol. p. 86. Rodriguez's conviction is further supported by unchallenged physical evidence—the Y-STR analysis of the **external** vaginal swabs. The jury learned that the comparable Y-STR DNA profile obtained from those samples was consistent with Rodriguez's Y-STR DNA profile to the highest statistical degree possible based on the crime lab's database. And the internal swabs contained male DNA.

In sum, the jury was presented with considerable, independent evidence of Rodriguez's guilt. And thus, even if we agreed with Rodriguez that the court erred in admitting evidence of the inconclusive test results, we are satisfied that there is not a substantial likelihood the challenged evidence contributed to the guilty verdict.

## Conclusion

The trial court acted within its discretion when it admitted evidence of the inconclusive scientific test results. That evidence was relevant, and its probative value was not substantially outweighed by a danger of unfair prejudice. But even if the court erred in admitting this evidence, the error was harmless.

[28]     Affirmed.

Bradford, C.J., and Najam, J., concur.